**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. NC-15-1415-JuKiTa |
| ) | |
| MORTGAGE FUND '08 LLC, ) | Bk. No. 11-49803 |
| ) | |
| Debtor. ) | Adv. No. 13-04190 |
| _____ ) | |
| SUSAN L. UECKER, Liquidating ) | |
| Trustee of the Mortgage Fund ) | |
| '08 Liquidating Trust, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M*** |
| ) | |
| ROBERT L. MONTGOMERY, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on July 28, 2016
at San Francisco, California

Filed – August 15, 2016

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Roger L. Efremsky, Chief Bankruptcy Judge, Presiding

_____

Appearances: Ben G. Young of Jeffer Mangels Butler and Mitchell LLP argued for appellant Susan L. Uecker; Richard S. Miller argued for appellee Robert L. Montgomery.

_____

Before: JURY, KIRSCHER, and TAYLOR, Bankruptcy Judges.

---

* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

-1-

Appellant Susan L. Uecker is the liquidating trustee (Trustee) appointed under the confirmed chapter 11[1] plan for debtor, Mortgage Fund '08 LLC (MF08). Trustee filed an adversary proceeding against appellee, Robert L. Montgomery (Montgomery), seeking to avoid and recover as a fraudulent transfer under § 544 and California state law a $150,000 payment made to Montgomery by The Mortgage Fund, LLC (TMF).[2] TMF was the sole owner, manager, and member of MF08.

Montgomery answered the complaint and pleaded several affirmative defenses, including settlement and release based upon an agreement between MF08 and its affiliate, chapter 11 debtor R.E. Loans, LLC (REL). The agreement settled disputes between the parties regarding MF08's $66 million proof of claim (POC) filed in REL's bankruptcy case that was commenced in Texas. As an investor and noteholder in REL's bankruptcy case, Montgomery's claim, and payment on that claim, was affected by the settlement. The Texas bankruptcy court approved the settlement agreement (SA), which was incorporated into REL's confirmed plan.

Trustee and Montgomery filed cross-motions for summary judgment. Trustee moved for summary judgment on her

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] On April 8, 2015, the bankruptcy court entered a scheduling order which consolidated this adversary with Uecker v. Bennett, Adv. No. 13-04194, for purposes of trial.

constructive fraudulent transfer claim for relief, and Montgomery moved for summary judgment on, among other things, his affirmative defense of settlement and release. After a hearing, the bankruptcy court took the matters under advisement.

The bankruptcy court subsequently issued a decision finding that the SA covered Trustee's fraudulent transfer claim against Montgomery and that all other issues raised in the summary judgment motions were moot. See Susan L. Uecker, Trustee of the Mortgage Fund '08 Liquidating Trust v. Montgomery (In re Mortgage Fund '08 LLC), 541 B.R. 467 (Bankr. N.D. Cal. 2015). The court entered an order granting Montgomery's motion for summary judgment (MSJ) and denying Trustee's MSJ. Trustee appeals from that order.[3]

The SA provides that California law governs its construction. Applying California law, we determine that the record, when viewed in the light most favorable to the Trustee, shows that there is no genuine issue of material fact as to the proper construction of the terms "REL Transfer," "Paid by REL," and "Any Third Party" as used in the SA. Therefore, Montgomery was entitled to judgment as a matter of law. Accordingly, we AFFIRM.

---

[3] Trustee also appealed the bankruptcy court's order granting summary judgment in favor of Bennett in the related adversary proceeding, BAP No. NC-14-1408. Trustee filed a notice of related appeals and a request for consolidation of the two appeals for oral argument. On March 4, 2016, a one-judge order set the related appeals before the same merits panel.

-3-

# I. FACTS[4]

## A. The MF08 and REL Bankruptcy Cases

On September 12, 2011, several investors filed a chapter 7 involuntary bankruptcy petition against MF08 in the bankruptcy court for the Northern District of California. The bankruptcy court converted the case to chapter 11 and entered an order for relief on September 28, 2011. As of the petition date, MF08 had about 472 noteholders who were owed approximately $80 million and held a real estate portfolio valued at around $72 million.

The bankruptcy court approved MF08's disclosure statement and confirmed its plan by order entered on February 3, 2012. Among other things, the order established the MF08 liquidating trust; Trustee has been in place since that time.

REL commenced its chapter 11 case in the Northern District of Texas on September 13, 2011.[5] At the time of its filing, REL had about 2,900 noteholders who were owed approximately $646 million (REL Noteholders). On September 22, 2011, the United States Trustee appointed the Official Committee of Noteholders (Noteholders Committee) in REL's bankruptcy case.

---

[4] We borrow heavily from the comprehensive facts set forth in the bankruptcy court's published opinion on this matter, Susan L. Uecker, Trustee of the Mortgage Fund '08 Liquidating Trust v. Montgomery (In re Mortgage Fund '08 LLC), 541 B.R. 467 (Bankr. N.D. Cal. 2015).

[5] Capital Salvage, a California corporation, and R.E. Future, LLC (RE Future), also filed chapter 11 cases on the same date as REL. Capital Salvage and RE Future were entities that owned most of the real property obtained through foreclosure sales by REL. REL is the sole shareholder of Capital Salvage and the sole member of RE Future. Those cases were jointly administered with REL's case.

**B.    Ownership and Operation of MF08 and REL**

Walter Ng and his sons, Kelly Ng and Barney Ng, owned, managed, and controlled, directly or indirectly, MF08 and REL and their related entities.

Walter and Kelly Ng formed REL in January 2002. REL was an investment company that issued secured loans to real estate developers. To raise money, REL sold unregistered securities to investors in exchange for making the investors "members" of REL. Montgomery was an investor and member in REL.

In 2007, REL faced liquidity problems due to decreasing values in the real estate market. Its attorneys also advised REL that that it had been violating state and federal securities laws by selling securities without registration as required by the Securities and Exchange Commission. Due to these violations, the attorneys urged REL to immediately stop soliciting new investments. As a result, by June 2007 REL had $20 million in loan commitments, had only $1 million cash on hand and could not meet the withdrawal requests from its investors.

In November 2007, REL made its members into noteholders in what is referred to as the "Exchange Transaction" and the issuance of "Exchange Notes."

To address REL's severe cash flow problems, in December 2007, Walter and Kelly Ng, created MF08 for the stated purpose of raising capital through the issuance of notes to investors and making loans secured by real estate with the funds raised. In reality, MF08 was part of a scheme perpetrated by the Ngs in which investors' money was funneled from MF08 to REL. According

to Trustee, MF08 transferred over $66 million of the approximately $80 million raised from MF08 investors to REL.

As mentioned above, TMF was MF08's sole owner, manager, and member. Walter Ng and Kelly Ng were the sole members of TMF and thus controlled MF08.

**C.   MF08's $66 Million POC in the REL Case**

Prior to Trustee's appointment as liquidating trustee, MF08 filed a POC in the REL case for $66,226,496. The attachment to the POC stated:

> [B]etween December 4, 2007, and February 4, 2009, **the Ngs caused** the aggregate sum of $66,226,496 to be transferred from MF08's bank account to [REL] (the "Cash Transfers"). The Cash Transfers were made either (1) directly to [REL], (2) **indirectly through [TMF] or Bar-K**, or (3) to [REL's] borrowers to enable such borrowers to service or repay loans extended to them by [REL]. (Emphasis added).

The POC alleged that the Ngs caused the "Cash Transfers" and that they were made with the "actual intent to hinder, delay or defraud entities to whom MF08 was or became, on or after the dates that such transfer[s] were made, indebted." Also included with the POC was a "Table of Cash Transfers from MF08 to the Debtor" which detailed the dates, check numbers, and amounts purportedly transferred by MF08 to REL from December 4, 2007, to February 4, 2009.[6] Trustee continued to assert the POC in the

---

[6] To be clear, the list of cash transfers showed only those transfers made from MF08 to REL and did not identify those transfers that REL made to the holders of the Exchange Notes, either directly or indirectly through TMF or Bar-K. MF08 maintained that if it could trace the funds to the holders of the Exchange Notes, it might have the right to pursue recovery from them. Due to the settlement of its POC, tracing became

(continued...)

REL bankruptcy case after her appointment.

**D.    MF08's Settlement with REL and Confirmation of the REL Plan**

REL informally objected to MF08's POC.  On April 24, 2012, Trustee, REL, and other principle stakeholders in the REL case - Wells Fargo Capital Finances, LLC (REL's secured lender) and the Noteholders Committee (representing Montgomery's interests as a REL Noteholder), participated in a judicial mediation regarding the dispute over the POC and other disputes related to confirmation of a plan.[7]  The parties did not reach a settlement on that date but continued to negotiate and eventually reached an agreement regarding the validity and priority of MF08's POC.

Prior to the execution of the SA, the Noteholders Committee sent a letter to the REL Noteholders, including Montgomery, dated May 16, 2012.  The committee recommended that the noteholders vote to accept the plan, explaining:

> [T]he Plan Compromise[8] represents a favorable outcome for Noteholders when weighed against the risk, uncertainty and potential cost of litigating against objections to the allowance or priority of the Noteholders' claims.  The proposed Plan Compromise resolves the debtors' and MF08's potential claims against Noteholders to recover prepetition distributions as alleged fraudulent conveyances, ensures that current Noteholders will not be at risk of being sued by the Liquidating Trustee for the

[6](...continued)
unnecessary.  To the extent that Trustee's counsel asserted at oral argument that the list defined the universe of Noteholders entitled to the waiver in question, the list could not do so, since it showed transfers to, not from, REL.

[7] Development Specialists, Inc. (DSI) also participated in the all-day mediation.  All the parties other than DSI agreed on the terms of the modified plan and the SA.

[8] The "Plan Compromise" is explained below.

-7-

recovery of distributions paid out years ago, and insulates Noteholders from the expense of defending against such litigation.

The parties, including Trustee, executed the SA on May 30, 2012. The SA allowed REL to proceed with confirmation of its plan.

REL filed a motion for approval of the SA under Rule 9019 (Motion). At the same time, REL filed its Modified Fourth Amended Joint Chapter 11 Plan of Reorganization, dated June 1, 2012, which had been amended to comply with the requirements of the SA with MF08.

In the Motion seeking approval, REL generally reiterated the provisions set forth in the SA. REL stated that MF08 contended, based on various theories, including that the transfers may have constituted intentional or constructive fraudulent transfers, that REL was liable to it for the $66 million received. The Motion defined the "REL Transfers" as the transfer of $66 million made between December 2007 and "approximately August of 2008" and REL's commingling of that amount in its general account with other REL funds. The Motion also stated that MF08 contended that "if it [could] trace the funds that it transferred to REL from REL to any given [REL] Noteholder, MF08 might have the right to pursue recovery from that [REL] Noteholder as a subsequent transferee pursuant to Bankruptcy Code § 550(b)." This potential right to assert claims against noteholders that received REL Transfers was defined as the "MF08 Potential Avoidance Actions."

The Motion then described the response by REL and the Noteholders Committee to MF08's contentions:

[REL] and the Noteholders Committee contend that

-8-

Noteholders who received the REL Transfers who were not insiders of [REL] cannot be liable to MF08 because (a) it is not possible to trace the dollars received from MF08 to any specific REL Transfer or transferee; and (b) each [REL] Noteholder that received an REL Transfer, with the possible exception of insiders of [REL], received any such REL Transfer on account of a debt payable by [REL] for value, in good faith, and without knowledge of the voidability of the transfer from MF08 to [REL] (even assuming that transfer is avoidable) and, therefore, would be shielded from liability pursuant to Bankruptcy Code § 550(b).

The Motion also described the "prior plan compromise" which had been negotiated by REL and the Noteholders Committee and the change to it which was now required by the proposed settlement with MF08. The prior plan compromise provided that if the REL Noteholders voted to accept the plan, the REL Noteholders' lien on REL assets would be released, they would share pro rata with holders of general unsecured claims and their claims would not be "subordinated or challenged," but each REL Noteholders' claim would be reduced by 50% of any cash received after the November 2007 Exchange Transaction through the REL petition date.

The proposed agreement with MF08 made one change to the "prior plan compromise." Instead of the REL Noteholders sharing pro rata with the REL general unsecured creditors, the first $5 million distributed was to go to the REL general unsecured creditors before the REL Noteholders would share pro rata. This change increased the distribution to general unsecured creditors, primarily benefitting MF08 as the largest such creditor, and reduced the distribution to REL Noteholders through reallocation of the first $5 million. In exchange for this "enhancement," MF08 agreed to vote its $66 million claim in favor of the plan. Per the agreement, MF08 would also waive its

right to pursue all MF08 Potential Avoidance Actions against REL Noteholders, and MF08 would be appointed to the trust oversight committee of the liquidating trust to be created under the REL Plan.

In seeking court approval for this agreement, REL explained that, absent this agreement, the parties would be forced to litigate the merits of the MF08 POC, the merits of the final plan compromise, the relative priorities and rights as between the holders of general unsecured claims and the REL Noteholders, and the merits of the MF08 Potential Avoidance Actions. This was an unattractive proposition because it would "consume substantial cash that would otherwise be distributable to REL Noteholders and MF08's creditors."

As further support, REL mentioned that many REL Noteholders were also investors in MF08 and paying the professionals to redistribute the limited funds available as between MF08 and REL would reduce the total amount received by all creditors. Litigating MF08's Potential Avoidance Actions would also likely be complex and could require expensive efforts to trace funds, and every dollar spent on professionals would reduce the amount available for distribution to creditors. The modified plan eliminated these issues and was supported by all stakeholders, including the committee of MF08's noteholders.

On June 18, 2012, the REL bankruptcy court confirmed REL's plan and approved the SA.

**E. The Relevant Sections of the SA**

The Recitals in section 2 of the SA state:

2.01. MF08 transferred cash in an amount equal to

-10-

$66,226,496 to R.E. Loans during the period from December of 2007 and through 2008.

2.02.  MF08 contends that R.E. Loans is liable to MF08 for the monies received on various theories, including without limitation based upon the contention that the transfers may have constituted fraudulent transfers.

2.03.  During the time period from December of 2007 through approximately August of 2008, R.E. Loans received cash and deposited that cash into its general account from multiple sources, including without limitation (a) the transfers from MFO8 described in 2.01, above, (b) payoffs by R.E. Loans' borrowers of principal and interest, (c) sales of assets, and (d) advances by Wells Fargo Capital Finance, LLC ("Wells Fargo").

2.04.  During the time period from December of 2007 through approximately August of 2008, R.E. Loans made payments out of its general account to many different parties, including without limitation payments to various creditors, including without limitation the holders of Exchange Notes issued to R.E. Loans' Noteholders (REL Transfers).

2.05.  MF08 contends that if it could trace the funds that it transferred to R.E. Loans as described in Paragraph 2.01 from R.E. Loans to the holders of Exchange Notes, MF08 might have the right to pursue recovery from the holders of Exchange Notes as "subsequent transferees" pursuant to Bankruptcy Code § 550(d).  R.E. Loans contends that holders of Exchange Notes who received the REL Transfers cannot be liable to MF08 because (a) it is not possible to trace the dollars received from MF08 to any specific REL Transfer; and (b) each holder of an Exchange Note that received an REL Transfer, with the possible exception of insiders who may have received an REL Transfer, received any such REL Transfer on account of a debt payable by R.E. Loans for value, in good faith, and without knowledge of the voidability of the transfer from MF08 to R.E. Loans (even assuming that transfer is avoidable) and, therefore, would be shielded from liability pursuant to Bankruptcy Code § 550(b).

2.06.  MF08's potential right to assert claims against holders of Exchange Notes that received REL Transfers shall be referred to herein as "MFO8's Potential Avoidance Actions".

Section 3.01-3.03 of the SA dealt with the allowance of MF08's claim in the REL case.  If REL's modified plan was

confirmed and the "Plan Compromise" approved by the Texas bankruptcy court, then MF08's POC "shall be allowed as a general unsecured claim against R.E. Loans in the amount of $66,226,496. . . ."

Section 4 of SA, titled "Waiver of Right to Pursue MF08 Potential Avoidance Actions," provides:

> 4.01.  If the MF08 Claim is Allowed pursuant to Paragraph 3, above, MF08 waives the right to pursue any MFO8 Potential Avoidance Actions; provided, however, that this Agreement shall not limit or restrict the right of MF08 to bring any action against any third party, including any manager, member, insider or professional of MF08.  This provision shall be void and of no further force or effect if the MF08 Claim is not Allowed pursuant to Paragraph 3, above.

> 4.02.  With respect to the claims released herein, MF08 acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and it expressly waives any and all rights under California Civil Code Section 1542 and under any other federal or state statute or law of similar effect with respect to the claims released herein.  Section 1542 of the California Civil Code provides as follows:

> > A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Finally, section 8 provided that the SA be interpreted according to California law.

**F.    The Transfer at Issue**

As noted, Montgomery was an investor in REL, an affiliate of MF08.  Montgomery was not an investor in, or a creditor of, MF08.

Montgomery had $924,887 invested in REL as of December 31, 2007.  In February 2008, Montgomery submitted a written request

to REL to return $450,000, or half of his principal investment, based on his decision to decrease his investment in real estate as an asset class.  REL then sold Montgomery's ownership shares in $150,000 increments, on June 17, 2008, July 23, 2008, and August 21, 2008, for a total of $450,000 as requested.  Checks representing these distributions were sent directly to Montgomery's Wells Fargo IRA account, with a contemporaneous statement indicating that all three payments came from REL. Trustee seeks to recover the second $150,000 transfer because it was made by a check written on TMF's bank account whereas the other two payments were made from REL's account.

The bank documents offered by both Trustee and Montgomery show the following sequence of events:

1. On July 21, 2008, REL transferred $528,791 to MF08.

2. On July 21, 2008, MF08 transferred $528,791 to TMF.

3.  On July 22, 2008, TMF wire transferred $400,000 to Troy Demanes, another REL Noteholder.

4. On July 23, 2008, TMF wrote check no. 1020 for $150,000 made payable to "WFB IRA Services fbo Montgomery."

4. On July 25, 2008, REL transferred $447,566 to MF08.

5. On July 28, 2008, MF08 transferred $447,566 to TMF.

6. On July 28, 2008, TMF's bank honored the $150,000 check to Montgomery.  Montgomery's IRA statement shows his account had received this $150,000 as of July 31, 2008.

From this sequence of events, the record shows that it is undisputed that in July 2008, REL transferred $528,791 to MF08 and then transferred $447,566 to MF08 and MF08 immediately transferred these exact amounts to TMF.  It is also undisputed

-13-

that when sufficient funds were in the TMF account, TMF's bank honored the check to Montgomery and it was credited to his IRA account on July 31, 2008.

**G.    The Underlying Adversary Proceeding**

On October 6, 2014, Trustee filed an amended complaint seeking to avoid and recover the $150,000, alleging that amount was fraudulently transferred by MF08 to TMF and then paid to Montgomery on July 23, 2008, with funds that could be traced to MF08.  The amended complaint further alleged that the $150,000 transfer to Montgomery was both intentionally and constructively fraudulent under California law.

On October 23, 2014, Montgomery answered the complaint. Montgomery denied that the $150,000 transfer to him by MF08 was intentionally or constructively fraudulent and alleged seven affirmative defenses.  In his second affirmative defense, Montgomery alleged that the court-approved SA in REL's bankruptcy case and REL's confirmed plan operated as a settlement and release of any fraudulent transfer claims MF08 could assert against him.  He also maintained that since he agreed under the SA to give up a valid claim of $450,000 in favor of MF08 and other creditors in return for MF08 obtaining priority repayment of the first $5 million in income from REL, this constituted value or reasonably equivalent value for purposes of § 548.[9]

---

[9] Although the complaint did not assert fraudulent transfer claims under § 548, Montgomery mentioned this section in his answer.

-14-

**H.    The MSJs**

On August 3, 2015, Trustee filed a MSJ on the constructively fraudulent claim under § 544 and Cal. Civ. Code § 3439.04(a)(2)(A).  Trustee argued that the undisputed facts showed that MF08 was entitled to avoid the transfer of $528,791 from MF08 to TMF and may recover $150,000 of it from Montgomery as either the initial transferee or the immediate transferee of the initial transferee as permitted under § 550(a).  Trustee also asserted that she was entitled to summary judgment disposing of Montgomery's affirmative defense under § 550(b) because there is no evidence that he gave value to TMF or MF08 and his interpretation of the SA was incorrect.

In support of her interpretation of the SA, Trustee maintained that the plain language of the SA showed that MF08 had released only a limited set of claims; i.e., claims against REL Noteholders who were paid by REL.  Because Montgomery received the funds from TMF, Trustee asserted that under section 4.01 of the SA, her right to "bring any action against any third party" was preserved, and Montgomery qualified as a "third party."  Finally, Trustee argued that there was nothing in the SA evidencing that the intent of the parties was to affect claims that were unknown at the time the SA was signed.

On August 17, 2015, Montgomery filed his MSJ, asserting that Trustee was barred from bringing the fraudulent transfer claim against him by MF08's prior settlement with REL in which it waived its rights to bring an avoidance action against him. He also argued that the actual source of the repayment of $150,000 was REL monies as shown by his tracing.  In support of

-15-

his MSJ, Montgomery requested the bankruptcy court to take judicial notice of numerous documents, including: (1) his REL investor portfolio account statement in which REL took credit for the $150,000 payment TMF ostensibly made to him; (2) the Noteholders' Committee's letter to the REL Noteholders; (3) the findings of fact and conclusions of law in support of the REL Confirmation Order; and (4) his Wells Fargo Bank IRA statement indicating payments had come from REL.

Two weeks later, Montgomery filed his opposition to Trustee's MSJ basically reiterating what he argued in his motion.

The bankruptcy court heard the motions on September 10, 2015. At the hearing, Trustee's counsel asserted that the primary question raised in the motions was whether MF08 released the avoidance action claims against Montgomery under the SA. Counsel argued that only a narrow category of claims were settled through the SA as shown by sections 2.04 and 2.05 of the SA. That is, only those avoidance claims that were paid by REL and not claims paid by TMF. He also maintained that the release in the SA under Cal. Civ. Code § 1542 was a "general release," and section 4.01 of the SA preserved unknown claims by authorizing Trustee to file any action against any "third party."

Following argument, the bankruptcy court took the matter under submission. On November 19, 2015, the bankruptcy court issued its memorandum decision finding that the release in the SA covered Trustee's claims in the adversary proceeding and that all other issues were moot. On the same day, the bankruptcy

court entered an order granting Montgomery's MSJ and denying Trustee's MSJ. Trustee filed a timely notice of appeal from that order.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUE

Whether the bankruptcy court erred in finding that the SA between MF08 and REL barred MF08's fraudulent transfer claims against Montgomery.

## IV. STANDARDS OF REVIEW

We review de novo the bankruptcy court's decision on cross-motions for summary judgment, applying the same standard used by the bankruptcy court. Brown v. City of L.A., 521 F.3d 1238, 1240 (9th Cir. 2008); Furnace v. Sullivan, 705 F.3d 1021, 1026 (9th Cir. 2013).

We also review de novo determinations of whether contract language is ambiguous, Tyler v. Cuomo, 236 F.3d 1124, 1134 (9th Cir. 2000), and "whether the written contract is reasonably susceptible of a proffered meaning." Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc., 971 F.2d 272, 277 (9th Cir. 1992); see also Winet v. Price, 4 Cal.App.4th 1159, 1165 (1992) (the court reviews determinations of whether contract language is ambiguous de novo); Scheenstra v. Cal. Dairies, Inc., 213 Cal.App.4th 370, 393 (2013) (even where uncontroverted evidence allows for conflicting inferences to be drawn, interpretation of contract is solely a judicial function);

-17-

*Sunniland Fruit, Inc. v. Verni*, 233 Cal.App.3d 892, 898 (1991) (de novo review "where the interpretation [of the contract] does not turn on the credibility of extrinsic evidence" and "where the extrinsic evidence points only one way, or is uncontested."); *Wolf v. Super. Ct.*, 114 Cal.App.4th 1343, 1351 (2004) (where the extrinsic evidence points only one way, or is uncontested, the meaning of the language in question may be ascertained as a matter of law).

## V. DISCUSSION

### A. Legal Standards for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Civil Rule 56(a), made applicable here by Rule 7056. Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248; see also *Aguilar v. Atl. Richfield Co.*, 25 Cal.4th 826, 856 (2001) (on summary judgment a court "does not decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself.").

When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."

-18-

*Anderson*, 477 U.S. at 255.[10]  The court is not precluded from drawing inferences against the non-moving party as long as the underlying facts are viewed in the light most favorable to that party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  In the end, the court "must determine whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Brown*, 521 F.3d at 1240.

A court may grant summary judgment regarding the interpretation of ambiguous language in a contract if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language. *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153 (2nd Cir. 2000); *see also* *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 33 (1st Cir. 1998) (summary judgment appropriate where extrinsic evidence presented to the court supports only one of the conflicting interpretations).

Under California law and summary judgment standards, Montgomery had the burden of proof on his affirmative defense to show that the SA operated as a complete defense to MF08's/Trustee's fraudulent transfer claims against him.

---

[10] Trustee has not argued on appeal that the bankruptcy court erred by weighing the extrinsic evidence.  Accordingly, those arguments are deemed waived for purposes of this appeal. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

**B.    Is the SA ambiguous?**

This appeal involves the interpretation of the SA under California law.  The threshold question is whether the SA is ambiguous; that is, reasonably susceptible to more than one interpretation.  Winet, 4 Cal.App.4th at 1165.  The question of ambiguity is a question of law subject to de novo review.  Id.

"Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself," United Teachers of Oakland v. Oakland Unified Sch. Dist., 75 Cal.App.3d 322, 330 (1977), or from extrinsic evidence of the parties' intent.  Winet, 4 Cal.App.4th at 1165.  In California, courts are required to receive provisionally any proffered extrinsic evidence that is relevant to show whether the contractual language is reasonably susceptible to a particular meaning.  Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc., 69 Cal.2d 33, 39–40 (1968) (rational interpretation of a contract requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties).  Such extrinsic evidence might expose a latent ambiguity when the contract appears unambiguous on its face.  Id. at 40 & n.8.  "An appellate analysis of the threshold question concerning whether the contractual language is ambiguous—that is, reasonably susceptible to more than one interpretation—usually involves the examination of competing interpretations offered by the parties."  Scheenstra, 213 Cal.App.4th at 393.

In seeking reversal of the bankruptcy court's order in favor of Montgomery, Trustee repeats many of the arguments that

-20-

she made before the bankruptcy court. Trustee relies upon the language of the SA itself for her interpretation and offers no extrinsic evidence in support. In a nutshell, she contends that Montgomery was not protected under the terms of the SA because he was paid by TMF and not from REL's general account. Thus, according to Trustee, he was not part of the protected class of REL Transferees under the SA, making MF08's waiver of avoidance claims inapplicable as to him.

To support her argument, she urges us to look at the defined terms in sections 2.04-2.06 of the SA. Section 2.04 defines a "REL Transfer" as payments made out of REL's general account to the holders of Exchange Notes issued to REL's Noteholders. Trustee asserts that this provision plainly shows that MF08 released only its claims against REL Noteholders for recovery of amounts **paid** by REL and that these are the MF08 Potential Avoidance actions MF08 agreed to release under section 2.06. She again also relies on section 4.01 which states that "this Agreement shall not limit or restrict the right of MF08 to bring **any** action against **any** third party." (Emphasis added). According to Trustee, the phrases "any action" and "any third party" are broad and include her avoidance action against Montgomery.

Montgomery also repeats his previous arguments in his opposing brief. He claims he was an REL Transferee within the meaning of the SA and, therefore, he is protected by MF08's waiver of the avoidance claims. To support his interpretation, he relies on extrinsic evidence such as the surrounding circumstances under which MF08 and REL negotiated or entered

-21-

into the SA, including the SA's relationship to REL's confirmed plan, and the language in MF08's POC. Montgomery points out that the main objective of the SA was to avoid expensive and uncertain litigation over whether MF08 had a legal basis to claim REL Transferees had received $66 million of MF08's monies. He further refers to MF08's admission in its POC that the Ng family controlled the bank accounts of REL, MF08, and TMF, and could have and did use MF08 monies to pay REL investors - the "Ngs caused the transfer" of $66 million, the transfers were made "either directly to REL, indirectly through TMF . . ., or [directly] to REL's borrowers."

Montgomery also traces the monies coming from REL's account that flowed to MF08 and then to TMF, and ultimately to his IRA account. Based upon this tracing, he contends that the $150,000 used to pay him was "directly" from the general account of REL.

In addition, Montgomery offered other extrinsic evidence to shed light on the mutual intention of the parties: (1) his REL investor portfolio account statement in which REL takes credit for the $150,000 payment TMF ostensibly made to him; (2) the Noteholders' Committee's letter to the REL Noteholders; and (3) his Wells Fargo Bank IRA statement indicating payments had come from REL.

In conducting our independent review into whether an ambiguity exists, we examined the SA and the POC and considered Montgomery's proffered extrinsic evidence. Based upon our review, we determine that the bankruptcy court did not err in ruling that the SA was ambiguous with respect to the terms "REL Transfer," "Paid by REL," or "Any Third Party," as those terms

-22-

were reasonably susceptible to the parties' competing interpretations. Accordingly, the bankruptcy court properly admitted all credible extrinsic evidence to aid it in interpreting the SA. Pac. Gas & Elec. Co., 69 Cal.2d at 37.

**C.   Interpretation of the SA**

This determination does not end our inquiry. Although the above-referenced terms are ambiguous, we still must consider whether the bankruptcy court appropriately resolved the ambiguity. The parties do not challenge the SA itself and presented no extrinsic evidence as to **their** intent at the time the SA was signed. This is not surprising since Montgomery was not a party to the SA and the negotiations and as the court ruled that the communications regarding the settlement of MF08's POC made during the mediation held in REL's bankruptcy case were confidential.[11]

The extrinsic evidence presented by Montgomery presented the context in which the contract arose and described the conduct of the parties in connection with the SA which cast light on their original intent. Although Trustee disputes the inferences to be drawn from this extrinsic evidence, the evidentiary facts themselves are not in conflict. The meaning of the terms "REL Transfer," "Paid by REL," and "Any third Party," was not dependent on the credibility of conflicting evidence. There were thus no factual issues for the bankruptcy court to resolve. Accordingly, we review the SA in the context

---

[11] Trustee filed a motion seeking to prohibit the use of mediation documents for any purpose in the litigation. The bankruptcy court granted that motion.

-23-

of the extrinsic evidence presented and make our own independent determination of its meaning. See Wolf, 114 Cal.App.4th at 1351; Scheenstra, 213 Cal.App.4th at 390.

We determine the construction of the ambiguous language by applying the appropriate canons of construction governing contracts. "'[W]here the language of the contract is ambiguous, it is the duty of the court to resolve the ambiguity by taking into account all the facts, circumstances and conditions surrounding the execution of the contract.'" Frankel v. Bd. of Dental Exam'rs, 46 Cal.App.4th 534, 544 (1996); Pac. Gas & Elec. Co., 69 Cal.2d at 40 (court may consider the circumstances under which the agreement was made, including its object, nature and subject matter). The goal is to interpret it to give effect to the mutual intent of the parties as it existed when they contracted. Cal. Civ. Code § 1636; see also Pac. Gas & Elec. Co., 69 Cal.2d at 38. It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce. Winet, 4 Cal.App.4th at 1165.

### 1. "REL Transfer" and "Paid by REL"

We begin with the ambiguous terms "REL Transfer" and "Paid by REL." Relying on the plain language of the SA, Trustee maintains that since Montgomery was paid by TMF from its bank account, he was not "paid by REL." Therefore, he did not receive a "REL Transfer" within the meaning of the SA and is not protected by MF08's waiver of avoidance actions.

This interpretation is not supported when we consider Montgomery's undisputed extrinsic evidence and the context under which settlement of MF08's POC was reached. The undisputed

-24-

evidence shows - as the MF08 POC stated - that the Ngs controlled MF08, TMF, and REL and had a pattern of treating them as they wished: "the Ngs caused the $66 million in transfers to be made, either directly or indirectly." Thus, in this Ponzi-like scheme, MF08 acknowledged in its POC that the Ngs did not differentiate between REL, MF08, or TMF.

The evidence also shows that by all appearances, Montgomery **had** been paid by REL and received a REL Transfer. As the bankruptcy court properly noted, Montgomery was paid during the time period described in the POC (i.e., December 2007 – February 2009), and in the time period in section 2.04 of the SA (i.e., December 2007 – August 2008) and his investor portfolio account statement showed REL took credit for making the $150,000 payment when it was made. In other words, REL's investor's account carried payment to Montgomery on its books.

In addition, the Noteholders' Committee's letter sent to Montgomery and other REL Noteholders is consistent with the documentation Montgomery received from REL before any controversy arose. See S. Cal. Edison Co. v. Super. Ct., 37 Cal.App.4th 839, 851 (1995) ("The rule is well-settled that in construing the terms of a contract the construction given it by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent.").

In the end, the extrinsic evidence shows that the parties to the SA necessarily intended that the waiver by MF08 of its right to sue any REL investor who had been paid with MF08 funds included anyone paid directly or indirectly by REL. Although

Trustee urges us to adopt her competing interpretation of the SA, she has offered no evidence in support of her position. Given the lack of evidence supporting Trustee's inferences and interpretation, the bankruptcy court reasonably concluded that Montgomery was entitled to judgment as a matter of law. See Anderson, 477 U.S. at 249 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

Indeed, the thrust of Trustee's argument on appeal is that the bankruptcy court misinterpreted or misused the extrinsic evidence. First, she contends that the bankruptcy court applied the wrong legal standard to interpret the SA based on improper extrinsic evidence. In this regard, Trustee relies on the bankruptcy court's statement that "[t]he extrinsic evidence is consistent on one essential point. By everything he was told by REL, it is reasonable to interpret the Settlement Agreement as Mr. [Montgomery] does." Trustee maintains that the bankruptcy court erroneously relied upon the statements of REL, only one party to the agreement, and Montgomery, a stranger to the agreement. Trustee contends that "at most" REL's communications to Montgomery show its subjective intent, but subjective intent is irrelevant. At another point, Trustee maintains that the Noteholders' Committee's letter is another example of their subjective intent. Trustee asserts that the letter does not evidence the mutual intent of the parties. Trustee contends

-26-

therefore that the court should have ignored this evidence.[12]

We are not persuaded by these arguments. Error would occur, if at all, if the bankruptcy court improperly admitted extrinsic evidence showing only the undisclosed subjective intent of REL or the Noteholders Committee, which is inadmissable and incompetent under the objective theory of contracts. Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., 109 Cal.App.4th 944, 960 (2003) ("[U]ndisclosed statements regarding intent or understanding of" the writing "are irrelevant to contract interpretation under the objective theory of contracts"; appellate court determines writing's meaning de novo "[a]fter winnowing out the extrinsic evidence that is irrelevant under the objective theory of contracts."). "While a party may not testify to his undisclosed subjective intent in entering into an agreement, the rule does not preclude admission of evidence of the surrounding circumstances, usage and custom in the industry, negotiations and discussion, or any other extrinsic evidence which may shed light on the mutual intention of the parties." Pac. Gas & Elec. Co., 189 Cal.App.3d at 1141-42.

We conclude that REL's statements to Montgomery and the Noteholders' Committee's letter to Montgomery fall within the latter type of evidence; i.e., the surrounding circumstances, negotiations, and discussion, and were not the mere "undisclosed

---

[12] Although MF08 did not author this letter, the compromise, which the letter urged the Noteholders to vote in favor of, was with MF08 and benefitted its POC. MF08's silence as to the letter's accuracy may be construed as an agreement with its assertions.

-27-

subjective intent" of REL or the Noteholders' Committee. Id. In other words, this extrinsic evidence objectively "shed[s] light on the mutual intent of the parties."

Next, Trustee complains that the court erred by using the extrinsic evidence to vary or modify the terms of the SA. However, what Trustee characterizes as error is, in fact, her disagreement over the bankruptcy court's interpretation of SA based upon the extrinsic evidence which we address in this appeal.

Finally, Trustee challenges the bankruptcy court's finding that the payment to Montgomery was made by REL and contends that this is not supported by the evidence. According to Trustee, the undisputed evidence shows that Montgomery received a check drawn on TMF's bank account. Therefore, at the very least, this creates a genuine issue of material fact, precluding at the summary judgment stage a finding that the payment had been made by REL. Trustee also maintains that the fact MF08 obtained the funds from REL is irrelevant because there is no evidence that MF08's control over the funds was restricted or conditioned in any way. According to Trustee, funds which are transferred to a debtor and are deposited into the debtor's bank account become property of the debtor unless the debtor's right to use the funds is restricted. Adams v. Anderson (In re Superior Stamp & Coin Co.), 223 F.3d 1004, 1009 (9th Cir. 2000).

Again, we are not persuaded. The Ninth Circuit's decision in In re Superior Stamp & Coin Co. is not helpful to Trustee's argument. There, a bank loaned money to the debtor on the express condition that the money was to be used to pay a

-28-

specific third-party creditor.  The bank, a new creditor, substituted itself in place of the old creditor that was paid with the "earmarked" money.  The Ninth Circuit defined the scope of the "earmarking" defense:

> [T]he proper inquiry is not whether the funds entered the debtor's account, but whether the debtor had the right to disburse the funds to whomever it wished, or whether their disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor.

223 F.3d at 1009.  The earmarking doctrine is inapplicable to this case since the record shows the Ngs were operating a Ponzi-like scheme.  Further, it is undisputed that the Ngs controlled the funds that were transferred from REL's general account to MF08 and then to TMF and ultimately to Montgomery in the course of this Ponzi-like scheme.  Under these circumstances, it is disingenuous for Trustee to claim MF08 had dominion and control of the funds.

In sum, Trustee failed to raise a genuine issue of material fact as to the proper interpretation of the terms "REL Transfer" and "Paid by REL."

### 2.    "Any Third Party"

We next consider the term "any third party" as used in section 4.01 of the SA.  Trustee maintains the bankruptcy court's construction of the savings clause in this section was erroneous.  Under section 4.01 of the SA, MF08 waived the right to pursue any MF08 Potential Avoidance Actions "provided, however, that this agreement shall not limit or restrict the right of MF08 to bring any action against any third party, including any manager, member, insider or professional of MF08."

Trustee argues that the bankruptcy court incorrectly construed this provision to mean that she could commence an action only against a "third party" that was a manager, member, insider or professional. According to Trustee, the savings clause in section 4.01 of the SA preserves **all** claims against **any** third party, other than those against REL Noteholders who were "paid by REL."

Read naturally, the section's use of the word "any" as in "any action" has an expansive meaning. However, we cannot construe the phrase as expansively as Trustee would like because the preservation of "any action" would ordinarily mean those claims not settled. Here, as discussed above, Montgomery was included in the class of protected transferees since he received a "REL Transfer" that was "Paid by REL," albeit indirectly. MF08 settled and released that potential avoidance action against him under the terms of the SA. We thus read the savings clause to preserve claims other than MF08 potential avoidance claims against the REL Noteholders which were settled. Limiting the types of claims, which were preserved in this manner, is not inconsistent with a construction that the word "including" in the phrase "any third party, including any manager, member, insider or professional of MF08" is expansive in the sense that the Trustee may pursue nonavoidance action claims against the expansive class of third parties.

Further, the record shows that the undisputed objective of the SA was (1) to resolve the issues regarding the validity and priority of MF08's claim which was based on the alleged fraudulent transfer of $66 million to REL where tracing was

problematic and the Ngs' commingling was endemic; (2) to eliminate the REL Noteholders' risk of being sued by both MF08 and REL as the alleged recipients of fraudulent transfers in order to ensure their support for REL's Plan; and (3) to eliminate MF08's ability to impede confirmation because MF08's $66 million claim made it the largest unsecured creditor in REL's case. Trustee's interpretation of "any third party" to include REL Noteholders who were paid by MF08 or TMF effectively would blunt these objectives.

As the bankruptcy court observed:

> If there was an intent to carve this group of REL Noteholders out of the release, it had to be precisely stated before the settlement was incorporated into REL's Plan. MF08 acknowledged from the start that the 'Ngs caused' every payment by any of these affiliated entities to be made in a way that suited their designs and the record shows the Trustee was in possession of records that would have enabled her to trace this transfer before she signed the Settlement Agreement. To pretend otherwise endorses a fiction—that MF08 had legitimate independent management.

> The Trustee obtained the $5 million "enhancement" and the REL Noteholders agreed to reduce their claims by 50% of what they had been paid on their REL investments pre-petition. The REL Noteholders were led to believe their risk of being sued—by MF08 and REL—as the recipients of allegedly fraudulent transfers was eliminated.

In sum, Trustee failed to raise a genuine issue of material fact as to the interpretation of the savings clause under section 4.01 of the SA. In the words of the bankruptcy court: "As a REL Noteholder, Mr. Montgomery is not the type of third party the Trustee may sue" on an avoidance action.

## VI. CONCLUSION

For the reasons stated, we AFFIRM.