FILED
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

May 27, 2022

Blaine F. Bates
Clerk

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# OF THE TENTH CIRCUIT

_____

IN RE CHUZA OIL COMPANY,

Debtor.

_____

PHILIP J. MONTOYA, Chapter 7 Trustee,

Plaintiff - Appellant,

v.

PAULA GOLDSTEIN, BOBBY
GOLDSTEIN PRODUCTIONS, INC., and
ROBERT "BOBBY" GOLDSTEIN,

Defendants - Appellees.

BAP No. NM-21-029


Bankr. No. 18-11836
Adv. No. 20-01008
Chapter 7


OPINION

_____

Appeal from the United States Bankruptcy Court
for the District of New Mexico

_____

Daniel White of Askew & White, LLC, Albuquerque, New Mexico for the Appellant.

Clifford C. Gramer Jr., Albuquerque, New Mexico for the Appellees.

_____

Before **ROMERO**, Chief Judge, **HALL**, and **ROSANIA**,[1] Bankruptcy Judges.

_____

**ROSANIA**, Bankruptcy Judge.

_____

[1] Joseph G. Rosania, U.S. Bankruptcy Judge, United States Bankruptcy Court for the District of Colorado, sitting by designation.

_____

The Debtor was an unprofitable petroleum production company that twice landed in bankruptcy. The confirmed chapter 11 plan in its first case required the Debtor to pay all general unsecured creditors in full before paying an insider note obligation. The Defendants are the Debtor's insiders, one of whom holds the subordinated note and two of whom guaranteed the note. After plan confirmation, the Defendants lent hundreds of thousands of dollars to the Debtor so it could make its plan payments and survive as a going concern. From the borrowed funds, the Debtor paid roughly $47,000 on the subordinated note even though general unsecured creditors were not yet paid in full. The postconfirmation insider loans were not enough to keep the Debtor afloat, and the chapter 7 trustee in the Debtor's subsequent bankruptcy case sued the insiders to recover the subordinated-note payments as preferential transfers, actual fraudulent transfers, and constructive fraudulent transfers. The Bankruptcy Court held a bench trial on the merits.

Relying on the earmarking doctrine, the Bankruptcy Court ruled for the Defendants on all three counts because there was no transfer of an interest of the Debtor in property, a required element under Bankruptcy Code §§ 547(b) and 548(a). The Bankruptcy Court also held (alternatively) that the Defendants satisfied the contemporaneous-exchange-for-new-value defense to the preference, that the Debtor did not intend to hinder, delay, or defraud creditors, and that the Debtor received reasonably equivalent value in exchange for the transfers. The chapter 7 trustee appeals the Bankruptcy Court's rulings on the preferential-transfer and constructive-fraudulent-transfer counts.

2

We conclude that each subordinated-note payment was a transfer of an interest of the Debtor in property under both §§ 547(b) and 548(a). We also conclude that such note payments were not intended to be, and were not actually, a reasonably equivalent or roughly equivalent exchange for new or other value given to the Debtor. Therefore, we reverse.

## I.    BACKGROUND

### A.    Loan history

The Debtor was a petroleum production company in New Mexico. Defendant Bobby Goldstein ("Bobby") controlled the Debtor as a shareholder, chief executive officer, and director. In 2012, the Debtor borrowed $500,000 from Leon Goldstein, Bobby's father, evidenced by an Installment Loan Promissory Note (the "Note"). The Note is secured by certain accounts receivable of defendant Bobby Goldstein Productions, Inc. ("BGPI"), which is owned and controlled by Bobby. BGPI and Bobby guaranteed payment of the Note.

### B.    The Debtor's prior chapter 11 bankruptcy

The Debtor filed a chapter 11 case in 2014 in the United States Bankruptcy Court for the District of New Mexico. A plan was confirmed in March 2016. The plan classifies non-insider and insider unsecured creditors in classes six and seven, respectively. The Note obligation was a class seven claim. Under the plan, class six claimants were to be paid 100% of their claims in 48 monthly payments. Class seven claims were to be paid only after all class six claims had been paid in full. Leon died at some point between 2012 and

plan confirmation. Leon's wife, defendant Paula Goldstein ("Paula"), held the Note on the confirmation date.

### C. Postconfirmation insider loans to the Debtor and postconfirmation payments on the Note

The Debtor was not profitable after it confirmed its chapter 11 plan, so the Debtor had to rely on insider loans to continue operating. On March 27, 2017, Paula lent the Debtor $99,853.88. In addition, Bobby and BGPI lent money to the Debtor when it ran low on cash and needed funds to pay creditors under the confirmed plan.

Despite the distribution scheme under the confirmed plan, the Debtor made payments on the Note, from September 2016 through December 2017, totaling $46,885 (the "Transfers"), even though not all class 6 claimants had been paid. Of that total, the Debtor made five payments totaling $15,635 to Paula in the year before the involuntary filing (the "First-Year Transfers") and another $31,250 in payments the year before that.

The Bankruptcy Court's opinion includes a chart that summarizes the funds transferred to the Debtor from the Defendants and to the Defendants from the Debtor from September 2016 through December 2017.[2] All of the transfers were made into and out of the Debtor's bank account at Wells Fargo. According to the chart, the Defendants transferred a net of $395,663.09 more into the Debtor than the Debtor transferred out to the Defendants.[3]

_____

[2] Opinion at 3-4, *in* Appellant's Amended App. at A186-87.

[3] It is difficult to reconcile all of the figures in the chart with the bank statements in evidence, but the parties do not dispute on appeal the accuracy of the chart.

**D.     Involuntary chapter 7 filing and the Trustee's subsequent avoidance litigation against the Defendants**

On July 25, 2018, an involuntary chapter 7 petition was filed against the Debtor. The Bankruptcy Court entered an order for relief in August 2018. Plaintiff Philip Montoya was appointed the chapter 7 trustee (the "Trustee").

On February 5, 2020, the Trustee filed an adversary proceeding against Paula Goldstein, seeking to avoid the First-Year Transfers as insider preferential transfers under 11 U.S.C. § 547(b) and to recover and preserve them for the benefit of the estate under 11 U.S.C. §§ 550 and 551.

The Trustee later filed an amended complaint, adding Bobby and BGPI as defendants and asserting three counts against all Defendants to avoid (a) the First-Year Transfers as preferential transfers to insiders under 11 U.S.C. § 547(b); (b) all the Transfers as actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A); and (c) all the Transfers as constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B). The amended complaint also sought to recover and preserve all of the Transfers for the benefit of the estate under 11 U.S.C. §§ 550 and 551.

In the parties' pretrial order, and at the trial, the parties stipulated to the following facts (among others):

- The Defendants were insiders of the Debtor at all relevant times.

- At the time of all Transfers, Paula was a creditor of the Debtor.

- All Transfers were made to Paula.

- All Transfers were made for the benefit of Bobby and BGPI.

5

- All Transfers were made while the Debtor was insolvent.

- The First-Year Transfers were made between ninety days and one year before the date of the filing of the bankruptcy petition.

- The First-Year Transfers enabled Paula to receive more than she would have received if (i) as a case under chapter 7 of the Bankruptcy Code (ii) the First-Year Transfers had not been made, and (iii) Paula received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

- Under the confirmed plan, Leon and any successor-in-interest, including Paula, was to receive payment from the Debtor on the class seven claim only if all class six claims were paid in full.

- At all relevant times, at least one class six claim under the plan remained due and owing.

- All Transfers were made on account of the Note.

- During the one-year insider preference period, each payment to Paula was made contemporaneously with one or more transfers of cash by Bobby or BGPI into the Debtor's Wells Fargo account that equaled or exceeded the amount of the contemporaneous payment to Paula.

E.     **Bankruptcy Court trial, opinion, and related appeal**

The Bankruptcy Court conducted a trial on May 12, 2021, and on July 16, 2021, the court entered its Opinion and Final Judgment, denying any relief to the Trustee and awarding relief to the Defendants on all counts in the amended complaint. The Bankruptcy Court, relying on the earmarking doctrine, held that all three counts failed because there

6

was no transfer of an interest of the Debtor in property, a required element under Bankruptcy Code §§ 547(b) and 548(a). In addition, the Bankruptcy Court held that (a) count 1 (preferential transfer) also failed because the Defendants (if necessary) established the contemporaneous-exchange-for-new-value defense under 11 U.S.C. § 547(c); (b) count 2 (actual fraudulent transfer) failed because the Debtor did not intend to hinder, delay, or defraud creditors; and (c) count 3 (constructive fraudulent transfer) failed because the Defendants provided reasonably equivalent value in exchange for the Transfers.

The Trustee timely appealed the Final Judgment, taking issue with all of the Bankruptcy Court's rulings. The Trustee later abandoned his appeal of the Bankruptcy Court's ruling on count 2 (actual fraudulent transfer).

## II.    JURISDICTION

The BAP has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[4] The Trustee filed his notice of appeal timely on July 19, 2021, within fourteen days of entry of the Final Judgment.[5] Neither party elected to have the district court hear this appeal. The Opinion and Final Judgment finally resolved all claims in the litigation. Therefore, the BAP has valid appellate jurisdiction.[6]

---

[4] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[5] *See* Fed. R. Bankr. P. 8002(a)(1).

[6] *See In re Durability, Inc.*, 893 F.2d 264, 266 (10th Cir. 1990) (noting that "the appropriate 'judicial unit' for application of these finality requirements in bankruptcy is not the overall case, but rather the particular adversary proceeding, or discrete controversy pursued within the broader framework cast by the petition").

## III.    STANDARDS OF REVIEW

Questions of law are reviewed de novo, questions of fact are reviewed for clear error, and matters of discretion are reviewed for abuse of discretion.[7] The standard of review for a mixed question of law and fact depends on whether answering it entails primarily legal or factual work.[8]

Whether there was a transfer of an interest of the Debtor in property is a legal issue reviewed de novo.[9] Equivalent value usually is a question of fact reviewed for clear error.[10] The parties' intent is a factual issue reviewed for clear error.[11]

---

[7] *Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 779 (10th Cir. BAP 2001).

[8] *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018).

[9] *Parks v. FIA Card Servs, N.A. (In re Marshall)*, 550 F.3d 1251, 1254-55 (10th Cir. 2008). The issue appears to be a mixed question of law and fact because it involves a determination of the Debtor's control over funds and whether the Debtor's bankruptcy estate was diminished by the Transfers. Overall, the issue appears to entail significant factual work, suggesting a clear-error review, but *Marshall* declared it is a legal issue.

[10] *Cf. In re Kelsey*, 270 B.R. at 779 (reasonably equivalent value under § 548 is a fact issue reviewed for clear error).

[11] *See, e.g., In re C.P.P. Exp. & Imp.*, Inc., 132 B.R. 962, 964 (D. Kan. 1991) (whether parties intended transaction to be a contemporaneous exchange for new value is a question of fact typically reviewed for clear error); *cf. DSC Nat'l Props., LLC, v. Johnson* (*In re Johnson)*, 477 B.R. 156, 168 (10th Cir. BAP 2012) (noting, in a § 523(a)(2)(A) case, that a bankruptcy court's findings of fact, including findings regarding intent, are reviewed for clear error).

## IV.    DISCUSSION

This appeal boils down to two primary issues: Did any of the Transfers involve a transfer of an interest of the Debtor in property? If so, was each Transfer intended to be (and was it actually) a reasonably equivalent or roughly equivalent exchange for new or other value given to the Debtor?[12]

**A.    Each First-Year Transfer was a preferential transfer of an interest of the Debtor in property under 11 U.S.C. § 547, and those First-Year Transfers are not saved by the contemporaneous-exchange-for-new-value defense**

The parties have stipulated that each First-Year Transfer satisfies all elements of an insider preference[13] except one: that each First-Year Transfer be of an interest of the Debtor in property. The Bankruptcy Court, relying on the earmarking doctrine, concluded that the Debtor did not have an interest in the funds used to make any of the Transfers, including the First-Year Transfers. The Bankruptcy Court also concluded that (even if the Debtor did transfer a property interest) the Defendants satisfied the contemporaneous-exchange-for-new-value defense under 11 U.S.C. § 547(c).

---

[12] In the trial before the Bankruptcy Court, the Trustee had the burden of proving the avoidability of the transfers under §§ 547(b) and 548(a)(1)(B). *See* 11 U.S.C. § 547(g); *In re Marshall*, 550 F.3d at 1254; *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 510 B.R. 342, 352 & n.27 (10th Cir. BAP 2014), *aff'd*, 805 F.3d 888 (10th Cir. 2015). The Defendants had the burden to prove any defense under § 547(c). *See* 11 U.S.C. § 547(g).

[13] A transfer to an insider is avoidable as a preference if the transfer: (1) is of an interest of the debtor in property; (2) is for the benefit of a creditor; (3) is made for or on account of an antecedent debt owed by the debtor before the transfer was made; (4) is made while the debtor is insolvent; (5) is made on or within one year before the date the bankruptcy petition was filed; and (6) allows the creditor to receive more than the creditor would otherwise be entitled to receive from a chapter 7 bankruptcy estate. 11 U.S.C. § 547(b).

Before turning to the merits, we will briefly summarize the relevant statutory framework and the most significant cases in the Tenth Circuit touching on the earmarking doctrine.

### 1.     *Property interests in a bankruptcy*

The Bankruptcy Code does not define the phrase "interest of the debtor in property," but the Supreme Court views the term "property of the debtor" as coextensive with the term "property of the estate" under Bankruptcy Code § 541.[14] Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[15] Property in which a debtor holds only legal title and not an equitable interest becomes property of the estate only to the extent of the debtor's legal title, but not to the extent of any equitable interest the debtor does not hold.[16]

For purposes of most bankruptcy proceedings, "[p]roperty interests are created and defined by state law."[17] Once that state-law determination is made, however, a court must still look to federal bankruptcy law to resolve the extent to which that interest is property of the estate.[18]

We have uncovered no New Mexico authority specifically addressing the issue presented here, but in general, the right to use an item or to control its use is a property

---

[14] *Begier v. I.R.S.*, 496 U.S. 53, 58-59 (1990).

[15] 11 U.S.C. § 541(a)(1).

[16] 11 U.S.C. § 541(d).

[17] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[18] *In re Dittmar*, 618 F.3d 1199, 1204 (10th Cir. 2010).

interest.[19] The right to use and control an item is a concept applied in the earmarking doctrine.

### 2. *Earmarking doctrine generally*

The earmarking doctrine is a court-made interpretation of the statutory requirement—under § 547(b) of the Bankruptcy Code and equivalent provisions in the Bankruptcy Act—that a voidable preference must involve a "transfer of an interest of the debtor in property."[20] Because the Bankruptcy Code and Bankruptcy Act did not define when a transfer of a debtor's property occurs, the definition was left to the courts.[21]

In every earmarking situation there is an "old creditor" (the pre-existing creditor who is paid off during the preference period), a "new creditor" or "new lender" who supplies the funds to pay off the old creditor, and the debtor.[22] The earliest version of the doctrine occurred in cases where the new creditor providing new funds to pay off the old creditor was a guarantor of the debtor's obligation, such as a surety, a subsequent endorser, or a contractual guarantor.[23] Where such a guarantor paid the old creditor directly, courts rejected the claim that such payment was a voidable preference.[24] Courts provided different

---

[19] *Muckleroy v. Muckleroy*, 498 P.2d 1357, 1358 (N.M. 1972) ("Broadly defined, property includes every interest a person may have in a thing that can be the subject of ownership, including the right to enjoy, use, freely possess and transfer that interest.").

[20] *In re Bohlen Enters., Ltd*., 859 F.2d 561, 565 (8th Cir. 1988).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id. See, e.g., Nat'l Bank of Newport v. Nat'l Herkimer Cty. Bank*, 225 U.S. 178, 185, 187 (1912) (concluding that there was no transfer of the debtor's property under § 60 of the

11

rationales for this conclusion, including that (1) the transfer was of the new creditor's, not the debtor's, property; (2) there was no diminution in the debtor's estate because the transaction merely substitutes one creditor for another; and (3) it would be unfair to the guarantor if his payment were avoided for the benefit of the bankruptcy estate, leaving the guarantor liable to pay a second time.[25]

Courts later expanded the earmarking doctrine to cover the fact scenario in this appeal: "Where the guarantor, instead of paying the old creditor directly, entrusted the new funds to the debtor with instructions to use them to pay the debtor's obligation to the old creditor, the courts quite logically reached the same result."[26] In this latter type of case, where a guarantor's new funds are placed in the debtor's possession before payment to the old creditor, courts found that the funds are not within the debtor's control, or are held "in trust," or the courts simply said they would not let form control over substance.[27]

Some courts have extended the earmarking doctrine beyond the guarantor context and have applied it to situations where the new creditor is not a guarantor but merely lends funds to the debtor for the purpose of enabling the debtor to pay the old creditor.[28] Other

---

Bankruptcy Act of 1898—and thus no preference—when a subsequent indorser used its own funds to pay the debtor's obligation directly to the old creditor).

[25] *In re Bohlen Enters,* 859 F.2d at 565.

[26] *Id.* (collecting cases).

[27] *Id.* (collecting cases).

[28] *Id.* (collecting cases).

courts have questioned whether it makes sense to extend the doctrine beyond the guarantor context.[29]

### 3. Tenth Circuit Court of Appeals cases touching on the earmarking doctrine or applying tests eerily similar to the earmarking doctrine

A trio of Tenth Circuit Court of Appeals cases have either discussed the earmarking doctrine or applied tests eerily similar to the earmarking doctrine when determining whether a debtor had a property interest in funds that were transferred as part of an alleged preference.

First, in *Ogden*, the Tenth Circuit Court of Appeals held that a ponzi scheme operator had a property interest in funds obtained from new "investors" and paid to old "investors" who had been clamoring for a return of their funds.[30] The court first noted that generally a debtor's transfer of nonearmarked, borrowed funds constitutes a preference, assuming the other elements of § 547(b) are met.[31] The court then noted an exception under the earmarking doctrine when a third party lends money to the debtor for the specific purpose of paying a selected creditor.[32] Because there was no indication in *Ogden* that the

---

[29] *Id.* (suggesting—but not holding—that the earmarking doctrine should not extend beyond guarantor context).

[30] *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1199 (10th Cir. 2002).

[31] *Id.* (citing *In re Smith*, 966 F.2d 1527, 1537 (7th Cir. 1992) ("When a debtor effectively borrows nonearmarked funds and exercises control by using the funds to pay a preferred creditor over others, the estate has been diminished.")).

[32] *In re Ogden*, 314 F.3d at 1199 (citing *Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1008–09 (9th Cir. 2000)).

13

new investors designated the purpose of their investment as paying the prior investors, the

debtor had a property interest in the transferred funds under § 547(b).[33]

Second, in *Marshall*, the Tenth Circuit Court of Appeals held that payments made

to the debtors' MBNA credit card accounts from their Capital One credit card accounts

constituted transfers of "an interest of the debtor in property" under § 547(b).[34] The court

identified and applied two tests used in other circuits to determine whether a debtor has an

interest in property transferred:  the "dominion/control" test and the "diminution of the

estate" test. Under *Marshall*'s dominion/control test, "a transfer of property will be a

transfer of 'an interest of the debtor in property' if the debtor exercised dominion or control

over the transferred property."[35] According to the court, the debtors' ability to control the

disposition of the loan proceeds was key. Citing *Ogden*, the court noted that a debtor's

discretionary use of borrowed funds to pay another debt is generally considered a

preferential transfer, with this caveat:

> The only exception to this rule is the earmarking doctrine . . . . Earmarking,
> even if extended beyond the codebtor context, only applies when the lender
> requires the funds be used to pay a specific debt. Here, Capital One placed
> no conditions on Debtors' use of the funds, it only honored their instructions.
> The earmarking doctrine is inapplicable.[36]

---

[33] *In re Ogden*, 314 F.3d at 1199.

[34] *Parks v. FIA Card Servs, N.A. (In re Marshall)*, 550 F.3d 1251, 1256-58 (5th Cir. 2008).

[35] *Id.* at 1255.

[36] *Id.* at 1257 (citing *In re Dilworth*, 383 B.R. 415, 418 (Bankr. N.D. Ohio 2007), *aff'd*, No. 07-8020, 2008 WL 649064 (6th Cir. BAP Mar. 12, 2008), *aff'd*, 560 F.3d 562 (6th Cir. 2009); *Parks v. Boeing Wichita Credit Union (In re Fox)*, 382 B.R. 800, 803 (Bankr. D. Kan. 2008); *Lewis v. Providian Bancorp (In re Getman)*, 218 B.R. 490, 493–94 (Bankr. W.D. Mo. 1998)).

14

*Marshall* then addressed the diminution-of-the-estate test, where "a debtor's transfer of property constitutes a transfer of 'an interest of the debtor in property' if it deprives the bankruptcy estate of resources which would otherwise have been used to satisfy the claims of creditors."[37] The net value of the debtors' estate in *Marshall* did not change when the new loan replaced the old loan, but the court concluded that the estate was diminished nevertheless because the new loan proceeds would have been part of the estate, and thus available for creditors, had they not been transferred away prior to bankruptcy.[38]

Third, in *Wagenknecht*, the Tenth Circuit Court of Appeals held that a mother's payment to her son's attorneys for his unpaid legal bills was not a transfer of "an interest of the debtor in property" under § 547(b).[39] The debtor asked his mother for a loan to pay his legal bills. Although the promissory note he signed for his mother did not place any conditions on the loan, the Tenth Circuit credited the mother's affidavit that she "'required ... as a condition of the loan, that the entire $21,672.65 be used exclusively to pay the specific debt owed to the Law Firm and for no other purpose.'"[40] The mother further stated that she "'would not have made [the] loan unless the funds were used exclusively to pay

---

[37] *Id.* at 1256.

[38] *Id.* at 1257-58.

[39] *Walters v. Stevens, Littman, Biddison, Tharp & Weinberg, LLC (In re Wagenknecht)*, 971 F.3d 1209, 1214-15 (10th Cir. 2020).

[40] *Id.* at 1212.

15

the Law Firm.'"[41] Three days after the debtor signed the promissory note, the mother delivered a check, drawn on her own bank account, directly to the law firm, which then cashed the check.

The court applied *Marshall*'s dominion/control and diminution-of-the-estate tests. According to the court, the debtor did not, and could not, exercise control over the funds transferred to the law firm because he did not have the ability to direct their distribution:

> Sharon [the mother] offered to make the loan with the limited condition that the funds be used to pay the Law Firm, and Eric [the debtor] accepted that condition. That condition meant that Eric never controlled the funds because, as further stated by Sharon, Eric could not "direct how those proceeds were used, applied, or distributed."[42]

Importantly, this portion of the court's holding does not appear to rely on the flow of funds from the mother to the law firm and whether the funds passed through the debtor's bank account. It was sufficient that the mother placed a condition on the loan and the debtor accepted that condition.

The Tenth Circuit then held that the payment did not diminish the debtor's estate because the mother wrote the check on her own account and delivered it directly to the law firm:

> [I]t never passed through Eric's estate at all. It is not as though Sharon wrote a check to Eric and instructed him to use the funds to pay the Law Firm. Rather, the funds were never deposited in any accounts in which Eric holds an interest, and Eric played no role in delivering the funds to the Law Firm. Thus, the evidence shows that the monies were never available "to satisfy the claims of creditors."[43]

---

[41] *Id.* at 1212.

[42] *Id.* at 1214.

[43] *Id.* at 1214 (citing *In re Marshall*, 550 F.3d at 1256).

16

This language in *Wagenknecht* suggests that the outcome of the diminution-of-the-estate test might have been different had the mother written a check to the debtor and instructed him to use the funds to pay the law firm.

Two final notes about *Wagenknecht*: First, the minority opinion asserts that "the majority effectively, albeit implicitly, adopts the earmarking doctrine,"[44] while the majority opinion states "emphatically" that the earmarking doctrine—which was raised in the bankruptcy court but not on appeal—was not the basis of its opinion.[45] The earmarking doctrine may not have been the basis of the majority opinion formally, but the court's dominion/control and diminution-of-the-estate tests are similar to the earmarking tests applied by other courts, as noted below.

Second, must the dominion/control test *and* the diminution-of-the-estate test be satisfied for there not to be a transfer of an interest of the debtor in property? Or is it enough to satisfy one test? *Marshall* and *Wagenknecht* leave those questions unanswered.

### 4.    *Tenth Circuit BAP's take on the earmarking doctrine*

In *Moses*, a decision predating *Marshall*, *Ogden*, and *Wagenknecht*, the Tenth Circuit BAP held that there was a transfer of an interest in the debtor's property under § 547(b) when the borrower deposited the loan check from the new secured lender into the

---

[44] *Id.* at 1217 & n.2.
[45] *Id.* at 1215 nn. 5-6.

17

debtor's bank account and then paid the old unsecured lender three days later.[46] According to the BAP, the debtor had a legal and equitable interest in the loan proceeds when the debtor signed the promissory note for the new loan, and thus the transfer to the old lender diminished the debtor's estate, which it considered the fundamental inquiry.[47] The BAP then unleashed a multilayered attack on the old lender's argument that the new-loan proceeds were earmarked for it and thus did not result in a transfer of an interest of the debtor's property under § 547(b).

First, the BAP described how the earmarking doctrine was originally applied in codebtor cases (where a guarantor or surety provided the debtor funds to pay the old creditor) to avoid the inequitable result of making the guarantor or surety pay twice if the payment to the old creditor is held to be a preference.[48] The BAP concluded that the earmarking doctrine had inappropriately been extended to cases where the new creditor was not a guarantor or surety; in those cases, the earmarking doctrine inappropriately benefitted the old creditor, who was likely clamoring for payment.[49] The BAP thus

---

[46] *Manchester v. First Bank & Tr. Co. (In re Moses)*, 256 B.R. 641, 649 (10th Cir. BAP 2000).

[47] *Id.* at 645 (citing *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1199 (10th Cir. 2002)).

[48] The BAP cited*, Nat'l Bank of Newport v. Nat'l Herkimer Cty. Bank*, 225 U.S. 178 (1912) as an example, but as noted above, the indorser in that case transferred its own funds directly to the old creditor.

[49] *In re Moses*, 256 B.R. at 647.

18

concluded that the earmarking doctrine would undermine the goals of § 547(b) if it were applied to the facts before it, which did not involve a codebtor.

Second, and "more importantly" to the BAP, the earmarking doctrine is not provided for in § 547 and does not assist in defining the elements of a preference under § 547(b).[50] According to the BAP, if a debtor receives funds from a new creditor to pay another creditor, "the debtor's interest in the funds must be analyzed under § 541, including any limitations thereunder, as for example, those set forth in § 541(b) and (d), and the limitation on § 541(a)(1) related to traceable property that the debtor holds in trust for another."[51]

Third, the BAP concluded that even if the earmarking doctrine applied to non-codebtor cases, the elements of earmarking had not been met. The court identified three earmarking tests used in different lines of cases:

- The "intent" test, which requires (a) an agreement between the new lender and the debtor that the new funds will be used to pay a specified debt; (b) performance of that agreement according to its terms; and (c) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.
  - According to the BAP, the "intent" test was not satisfied because there was no agreement between the new lender and the debtor regarding

---

[50] *Id.* at 647-48.

[51] *Id.* at 648.

the use of the loan proceeds. Although the debtor told the new lender he intended to pay the old creditor with the loan proceeds, the promissory note contained no such restriction, and the lender did not approve the loan with any such restriction. The intent test also failed because (as the BAP previously concluded) the debtor's payment to the old lender diminished the estate.

- The "control" test, which reviews whether the debtor had control over the funds supplied by the new creditor; in making this determination, courts consider whether the new creditor restricted the use of the funds, whether the debtor had physical control over the funds, and whether the debtor had the ability to direct to whom the funds should be paid.

  o The BAP found this test unsatisfied because the new loan was not conditioned in any way on the payment to the old creditor.

- The "diminution of the estate test," which asks whether the estate was diminished by the transfer.

  o The BAP found this test unsatisfied because (as noted above) the BAP found that the debtor's use of the loan proceeds to pay the old creditor diminished the estate.

Fourth, the BAP concluded that even if the earmarking doctrine were somehow viable, its application would not be appropriate because—as a matter of law—it never

applies when an unsecured loan (such as the old, paid loan) is replaced by a secured loan (such as the new loan).[52]

### 5. Application of dominion/control test and diminution-of-the-estate test (possibly also known as the earmarking doctrine)

In their briefs on appeal, the parties debate extensively whether the earmarking doctrine is viable in the Tenth Circuit after *Moses*. The Trustee focuses on language in the opinion suggesting that the earmarking doctrine has no place in determining whether there was a transfer of an interest of the debtor in property under § 547(b). The Defendants focus instead on language in the opinion suggesting that the earmarking doctrine is still viable in the codebtor/guarantor context. Although the *Wagenknecht* majority opinion disclaimed any reliance on the earmarking doctrine, its two tests (dominion/control and diminution-of-the-estate), as the minority opinion noted, are functionally the same as the tests for the earmarking doctrine. Given the Tenth Circuit's adoption of the dominion/control test and the diminution-of-the-estate test for purposes of analyzing § 547(b), the debate over *Moses* and the earmarking doctrine (in name) appears to be a moot point. This Court will apply the Tenth Circuit's dominion/control test and the diminution-of-the-estate test to determine whether there was a transfer of an interest of the Debtor in property.

---

[52] *Id.* (citing, among other authorities, *Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1009 n.3 (9th Cir. 2000) ("This third requirement of the earmarking exception [no diminution of the estate] is not met where the amount of the estate available for creditors is diminished even though the funds transferred to the old creditor were not the debtor's property because they were never in the debtor's 'control.' Typically, this occurs where the debtor transfers a security interest in property to the new creditor by offering collateral for the loan. In such situations, an unsecured creditor is replaced with a secured creditor, thus diminishing the amount available in bankruptcy for creditors of the same class.")).

a)    **The Debtor did not have control over the conditionally lent funds under the *Wagenknecht* and *Marshall* test for dominion/control**

Bobby admitted at trial that there was no formal, written agreement concerning the insider loans and how they were to be used. But Bobby testified unequivocally about a condition placed on the loans:

> Q.    Well, when money went into Chuza, was there a condition that Chuza spend that money to pay Paula?
> A.    Yes. And that was the reason for the deposits.
> Q.    Okay. And as head of Chuza, when you paid Paula, you were performing that condition, weren't you?
> A.    Yes.[53]

These facts are similar to those in *Wagenknecht*, where there was no formal written agreement between the debtor and his mother concerning how the mother's loan was to be used, but the mother testified (via affidavit) that she placed a condition on the loan that the funds were to be used exclusively to pay the law firm, and the debtor accepted the condition. The Tenth Circuit concluded the debtor did not have control of the funds under those facts because he did not have the ability to direct the distribution of the funds. It is true that the borrowed funds in *Wagenknecht* were never deposited into the debtor's bank account, but the Tenth Circuit does not appear to have relied on that fact, at least when addressing the dominion/control test. The court's focus was on the lender's condition for the loan and the debtor's acceptance of that condition: "That condition meant that Eric

---

[53] Appellant's Amended App. at A067.

22

never controlled the funds because, as further stated by Sharon, Eric could not 'direct how those proceeds were used, applied, or distributed.'"[54]

Here, Bobby was acting for three parties, so there is a metaphysical aspect to Bobby (acting for himself and BGPI, as lenders) placing a condition on the loans, and Bobby (acting for the Debtor) accepting that condition, but there appears to have been a meeting of the minds limiting the use of the loan proceeds.

Notwithstanding the condition placed and accepted on the loans for the Transfers, the Trustee argues that the funds were under the Debtor's dominion and control because they were in the Debtor's Wells Fargo account, giving the Debtor the power to use the funds for any purpose. Although no Tenth Circuit Court of Appeals case appears to have addressed this argument under similar facts (where funds are in the debtor's account but were accepted subject to a condition to use them for a particular purpose), the Ninth Circuit—when addressing "control" under the earmarking doctrine—rejected it:

> The [bankruptcy] court suggested that Superior [the debtor] "controlled" the borrowed funds because the advances from the bank were deposited in Superior's account rather than paid directly to Adams [the old creditor] by the bank. This gave Superior "control," the court stated, because possession of the funds gave it the power (though not the right) to divert the loan to another use. . . . The fact that Superior may have had the *power* to divert the loan after it was deposited into Superior's account does not amount to "control" of the funds by Superior. If it did, the earmarking doctrine would have been limited to situations in which the guarantor or other new creditor paid the old creditor directly. For when the funds are first handed-over to the debtor, the debtor will, by virtue of possession, almost always have the power to break the agreement to transfer the funds to the old creditor. Accordingly,

---

[54] *Walters v. Stevens, Littman, Biddison, Tharp & Weinberg, LLC (In re Wagenknecht)*, 971 F.3d 1209, 1214 (10th Cir. 2020).

the proper inquiry is not whether the funds entered the debtor's account, but whether the debtor had the right to disburse the funds to whomever it wished, or whether their disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor. [55]

The *Superior Stamp* ruling is consistent with the Tenth Circuit's application of dominion/control. Under *Wagenknecht* and *Marshall*, the Debtor did not have control over the conditionally lent funds because the Debtor could not direct their distribution.

> **b)     Notwithstanding the Debtor's lack of control over the conditionally lent funds, the Debtor's estate was diminished by the Transfers because of the resulting replacement of subordinated debt with unsubordinated, unsecured debt**

*Marshall* and *Wagenknecht* both favor the Trustee on the diminution-of-the-estate test. The Defendants highlight the net funds of roughly $400,000 they deposited into the Debtor to argue that the Debtor's estate was not diminished by the Transfers. But in *Marshall*, the Tenth Circuit was not focused on the money coming into the debtor's account, which left the estate "net" neutral; the court was focused instead on whether the funds that left the account would have been available to pay creditors had they not been transferred prior to bankruptcy. If the funds would have been available, the estate was diminished by the transfer. Under the *Marshall* rationale, a million dollars could have entered the account from the new creditor, but a transfer of $5,000 out of the account would have depleted the estate if that $5,000 would have been available to pay creditors in a bankruptcy had it not been transferred.

---

[55] *In re Superior Stamp & Coin*, 223 F.3d at 1008–09.

And in *Wagenknecht*, when finding no diminution to the debtor's estate, the Tenth Circuit highlighted the facts that the borrowed funds never passed through the debtor's account and that the debtor played no role in delivering the funds to the law firm. "It is not as though Sharon wrote a check to Eric and instructed him to use the funds to pay the Law Firm."[56] Here, Bobby and BGPI deposited funds directly into the Debtor's Wells Fargo account, and the Debtor transferred the funds to Paula when paying her, factors the Tenth Circuit suggested—albeit in dicta—show the funds would have been available to pay creditors had they not been transferred.

Neither *Marshall* nor *Wagenknecht* faced the facts present here: loan proceeds accepted by a debtor subject to a condition on their use (thus no control over them by the debtor), but transferred into and out of the debtor's account on their way to the old creditor. We need not decide whether the Debtor's estate was diminished *solely* by the transfers of funds into and out of the Debtor's bank account because—under these unique facts—the Debtor's estate was diminished through each Transfer by the replacement of subordinated debt to Paula (which was not supposed to be paid until all class 6 claimants under the chapter 11 plan were paid in full) with new, unsubordinated debt to the insiders. In this respect, the facts here are analogous to those in *Moses*, where the Tenth Circuit BAP said that even if the earmarking doctrine were somehow viable in the case on appeal, its application would not be appropriate because—as a matter of law—it never applies when

---

[56] *In re Wagenknecht*, 971 F.3d at 1214.

an unsecured loan is replaced by a secured loan.[57] The rationale is that a debtor's transfer of security for the new loan lessens the amount of assets available for other unsecured creditors. Here, the replacement of subordinated debt with regular unsecured debt lessens the chance other unsecured creditors will be paid in full because they now share the Debtor's available funds equally with new creditors Bobby and BGPI rather than sharing available funds ahead of subordinated creditor Paula.

The Defendants (again) point to the additional hundreds of thousands of dollars they lent the Debtor to pay other creditors, arguing that these extra funds augmented the estate rather than diminished it.[58] But *Marshall* instructs this Court to focus not on the funds entering the estate, but instead on the funds leaving the estate. Each Transfer left the estate saddled with regular unsecured debt instead of lower-priority subordinated debt. Moreover,

---

[57] *Manchester v. First Bank & Tr. Co. (In re Moses)*, 256 B.R. 641, 651 (10th Cir. BAP 2000) (citing, among other authorities, *In re Superior Stamp & Coin*, 223 F.3d at 1009 n.3 ("This third requirement of the earmarking exception [no diminution of the estate] is not met where the amount of the estate available for creditors is diminished even though the funds transferred to the old creditor were not the debtor's property because they were never in the debtor's 'control.' Typically, this occurs where the debtor transfers a security interest in property to the new creditor by offering collateral for the loan. In such situations, an unsecured creditor is replaced with a secured creditor, thus diminishing the amount available in bankruptcy for creditors of the same class."). *Moses* similarly concluded that the defendant's contemporaneous-exchange-for-new-value defense failed because the estate was diminished by the exchange of unsecured debt for secured debt.

[58] The Bankruptcy Court did not address this issue in the portion of the Opinion dealing with the earmarking doctrine, which requires that the estate not be diminished. The Bankruptcy Court addressed the similar argument in connection with the Defendants' contemporaneous-exchange-for-new-value defense to the preference action, and with the reasonably-equivalent-value component of the constructive-fraudulent-transfer claim, both discussed below.

because § 547(b) allows a trustee to avoid "any transfer of an interest of the debtor in property,"[59] the Court's focus needs to be on each individual transfer of property and the effect it had on the estate, not on different loans that enabled the Debtor to pay noninsider creditors, even though those transfers to other creditors may have happened at roughly the same time as the Transfers to the insiders.

For these reasons, under the peculiar facts here, the Transfers diminished the estate by leaving the Debtor saddled with new, unsecured debt rather than with old, subordinated debt. *Marshall* and *Wagenknecht* provide no clear guidance on whether the dominion/control test *and* the diminution-of-the-estate test must be satisfied for there not to be a transfer of an interest of the debtor in property. In the absence of definitive guidance from the Tenth Circuit on this issue, we conclude that—notwithstanding the Debtor's lack of control over the borrowed funds—each Transfer was a transfer of an interest of the Debtor in property due to the diminution of the Debtor's estate caused by the subordinated-for-unsecured debt exchange.

### 6. *The Defendants' contemporaneous-exchange-for-new-value defense fails*

Even though all the elements of an avoidable preference are met (including the requirement of a transfer of an interest of the Debtor in property), the Defendants assert the contemporaneous-exchange-for-new-value defense under 11 U.S.C. § 547(c):

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

---

[59] 11 U.S.C. § 547(b).

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;[60]

The Bankruptcy Court acknowledged that *Moses* disallowed a defendant's § 547(c)(1) defense when the estate was diminished through the replacement of unsecured debt with secured debt. But according to the Bankruptcy Court, even though the Transfers replaced subordinated debt with unsubordinated debt, there was "more than enough" value provided by the Defendants for the § 547(c)(1) defense to prevail given that the Defendants provided the Debtor a net amount of roughly $400,000, more than eight times the amount paid to Paula. The Bankruptcy Court provided the following examples:

> For each of the 13 challenged payments to Paula, there was a contemporaneous exchange of new value greater than the amount of the payment. In some cases the difference was trivial (e.g. a $75 difference for the transfers on December 1, 2017) but most often the difference was quite significant. For example, on March 7, 2017, BGPI transferred $31,000 to Debtor, while Debtor transferred $3,125 to Paula. Similarly, on March 31, 2017, BGPI transferred $26,500 to Debtor while Debtor transferred $3,125 to Paula. Overall, there was more than enough exchange value for the § 547(c)(1) defense to prevail.[61]

The Bankruptcy Court erred here for three reasons. First, the Bankruptcy Court erred in considering pre-preference-period payments for this defense. The Debtor made five payments to Paula during the one-year insider preference period that reaches back to July 25, 2017. The § 547(c)(1) defense applies only to these payments to Paula during the preference period, so the only relevant contemporaneous exchanges for the defense are

---

[60] 11 U.S.C. § 547(c).

[61] Opinion at 7, *in* Appellant's Amended App. at A190.

those close in time to the payments that occurred in the insider preference period. In other words, for this *specific* defense, the Bankruptcy Court should not have considered (for example) the significant deposits in March 2017 (which were made far outside the preference period) as examples of "contemporaneous" exchanges that were "more than enough" to support the § 547(c)(1) defense.[62]

Second, we agree with the Trustee that there is no evidence in the record that the parties intended each First-Year Transfer to be an "exchange" for new value given to the Debtor. According to the Defendants, Bobby and BGPI provided significant new value in "exchange" for the Transfers to Paula by lending hundreds of thousands of dollars extra to the Debtor to pay noninsider, general unsecured creditors. But the term "exchange" implies that something is given in return for something else. Had Bobby and BGPI told the Debtor, for example, "We will lend you money to pay Paula, and if you actually use the loan proceeds to pay Paula, we will immediately lend you even more money to pay noninsider, general unsecured creditors," and had the Debtor agreed to those terms, then the additional

---

[62] As noted above, the parties stipulated that each payment to Paula during the one-year preference period was made contemporaneously with one or more transfers of cash by Bobby or BGPI into the Debtor's Wells Fargo account that equaled or exceeded the amount of the contemporaneous payment to Paula. A fair reading of that stipulation would not include a consideration of deposits made by the Defendants many months before the alleged preference payments. The Bankruptcy Court's ruling appears to be a legal error, but to the extent the court's ruling is construed as a factual finding that the deposits made many months before the preference period were contemporaneous with the alleged preference payments, that finding would be clear error. *Anstine v. Centex Home Equity Co., LLC (In re Pepper)*, 339 B.R. 756, 759 (10th Cir. BAP 2006) ("Whether a transaction was contemporaneous within the meaning of the exception to the preferential transfer statute is a question of fact that is reviewed for clear error.").

29

loans could be considered an "exchange" for the Transfers to Paula. But the record is devoid of any such conversation or any other evidence reflecting an intent to create such an exchange. The extra cash deposits from Bobby and BGPI to pay other creditors may have *coincided* with the Transfers to Paula, but they were not "in exchange" for the Transfers to Paula.

Third, even if the parties did intend to create a reasonably equivalent exchange, the value in a contemporaneous exchange under § 547(c)(1) must approximate the worth of the asset transferred to qualify as an exception to the preference provision.[63] Here, it did not. For the same reasons discussed above regarding the diminution-of-the-estate test, the Debtor's estate was diminished by the replacement of subordinated debt with unsubordinated debt for each individual Transfer.

**B.    Each Transfer was a constructively fraudulent transfer of an interest of the Debtor in property under 11 U.S.C. § 548(a)(1)(B)**

Count 3 of the amended complaint seeks to avoid all Transfers as constructively fraudulent under 11 U.S.C. § 548(a)(1)(B). Because the Defendants stipulate that the Debtor was insolvent during the Transfers and that the Transfers were made within two years of the bankruptcy filing, the Trustee can avoid each Transfer if there was a "transfer

---

[63] *In re Robinson Bros. Drilling, Inc.*, 877 F.2d 32, 34 (10th Cir. 1989) (citing *In re Finelli Jewelry Co.*, 79 B.R. 521, 522 (Bankr. D.R.I. 1987)). Following *Moses*, the Bankruptcy Court concluded that the defense applies even if new value is furnished by a third party (here, Bobby and BGPI) rather than the creditor (Paula). The Trustee does not dispute that conclusion.

. . . of an interest of the debtor in property," and if the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation."[64]

The Bankruptcy Court relied on the earmarking doctrine to conclude that there was no transfer of an interest of the Debtor in property under § 548(a)(1).[65] Because transfer of "an interest of the debtor in property" is equally a statutory requirement under § 548(a)(1) as it is under § 547(b), the same analysis discussed above regarding *Marshall* and *Wagenknecht* applies here, and the Court reaches the same conclusion: The Debtor transferred a property interest through each Transfer.[66]

The Trustee also raises two additional arguments on appeal with respect to § 548(a)(1). First, the Trustee argues that the value received by the Debtor was not reasonably equivalent to the Transfers. "Reasonably equivalent value" is not defined in the Bankruptcy Code, but for § 548 purposes, "value" is defined to include "property, or satisfaction or securing of a present or antecedent debt of the debtor."[67] The Bankruptcy Court observed that repayment of an antecedent debt, like a loan, satisfies the reasonably-equivalent-value requirement. But we agree with the Trustee that value of each alleged

---

[64] 11 U.S.C. § 548(a)(1)(B)(i).

[65] Opinion at 10, *in* Appellant's Amended App. at A193 (citing *In re TriGem Am. Corp.*, 431 B.R. 855 (Bankr. C.D. Cal. 2010) (applying earmarking doctrine to § 548(a)(1)).

[66] *Cf. In re TriGem Am. Corp.*, 431 B.R. at 864 (earmarking doctrine can be asserted in both preference cases and fraudulent-transfer cases: "In both instances what matters is that in an earmark case there is no diminishment of the estate, and it is that diminishment of assets that would otherwise be available to pay creditors that is at the heart of all avoidance actions.").

[67] 11 U.S.C. § 548(d)(2)(A).

"exchange" was affected by the replacement of subordinated debt with unsubordinated debt. Given the net detriment to the estate from the replacement of lower priority unsubordinated debt with higher priority unsecured debt, the Debtor did not receive reasonably equivalent value for each alleged exchange.

Second, the Trustee argues that whatever value the Defendants provided with the extra cash deposits to pay other creditors was not "in exchange" for the Transfers. According to the Trustee, only the precise amount received by the Debtor to pay Paula was "in exchange" for the Transfers; the extra cash could not possibly have been "in exchange" for the Transfers since that extra cash was not needed to pay Paula with the Transfers. This issue overlaps with the issue discussed above about whether the parties intended each First-Year Transfer to be an "exchange" for new value given to the Debtor. For the same reasons discussed above, we conclude that the extra cash deposits from Bobby and BGPI to pay other creditors may have coincided with the Transfers to Paula, but they were not "in exchange" for the Transfers to Paula.

## V.     CONCLUSION

Each First-Year Transfer was a preferential transfer of an interest of the Debtor in property under 11 U.S.C. § 547, and those First-Year Transfers are not saved by the contemporaneous-exchange-for-new-value defense. And each Transfer was a constructively fraudulent transfer of an interest of the Debtor in property under 11 U.S.C. § 548(a)(1)(B). We therefore **AFFIRM** the Final Judgment to the extent it awards relief to the Defendants on the actual-fraudulent-transfer count, but **REVERSE** the Final Judgment

to the extent it awards relief to the Defendants on the counts for preferential and constructively fraudulent transfers.